IN RE THE ASSIGNMENT OF EDWARD PURCELL AND THE ASSIGNMENT OF JOHN B. PURCELL.

*Assignee—Maladministration—Removal—Compensation.*

On the hearing of exceptions properly taken to the account of an assignee of an insolvent estate, the Probate Court has jurisdiction to determine the effect upon title, of the deed of

assignment and precedent conveyances of real estate, as far as the same is involved in the disputed items of such account.

An assignee of two insolvent estates filed in the case of each assignment, one and the same account, improperly mingling together the receipts and disbursements of the one estate with the receipts and disbursements of the other, and describing himself therein as the assignee of the two estates jointly, and subsequently for maladministration was removed from his office of assignee in the case of each estate. On hearing of exceptions properly taken to said account in the case of each assignment, and on behalf of each estate, *Held*, That the Probate Court may separate the joint account, and make a finding of the items therein that properly belong to the account of the assignee in the case of each estate.

An assignee of an insolvent estate who maladministers, and thereby causes loss and expense to the beneficiaries of his trust, will not be entitled to an allowance for compensation in any form, whether as statutory commissions, counsel fees for services rendered, or extraordinary services.

An assignee who delays, unreasonably, to file his account, as required by law, will be charged with interest from the date his account became due; and a delay of six years to account, after the date at which the account became due, is an unreasonable delay and sufficient to charge him with such interest.

*Decided May* 13, 1886.


At the dates of the assignments John B. Purcell was Archbishop of the Roman Catholic Church for the diocese of Cincinnati, and his brother, Edward Purcell, was the Vicar-General and the manager of the temporal and financial affairs of the diocese. John held title in real estate of considerable value, the greater portion of which was in use for religious

and charitable purposes by various organizations of the Catholic faith. Edward held a large quantity of notes, due-bills and accounts against various parties to whom he had made loans. A custom had grown up in the diocese of receiving from the adherents of the church deposits of moneys on which interest was paid. The moneys so received by Edward, and the moneys received by John in his ecclesiastical office, were put into a common fund out of which loans were made, real estate properties purchased and improved, and churches, schools and charities helped and sustained. This custom had resulted in financial embarrassment involving both Edward and John. Partly by written form and obligation, and otherwise by unequivocal acts and declarations, each had become liable for the debts of the other. An indebtedness to many persons, and in an unknown aggregate amount, had accumulated, and creditors were pressing claims which neither John nor Edward, nor both of them together, had the ability to meet. On the 20th day of January, 1879, John had executed a mortgage of realty to five "Diocesan Trustees" for the purpose of obtaining a contemplated loan to pay this indebtedness. That expedient developed an insolvency amounting to millions of dollars, and was found to be wholly inadequate and impracticable. By the 1st of March following, affairs had reached such a crisis that an assignment appeared inevitable An

assignment by John was thought unbecoming to his ecclesiastical office. After consultation the plan was formed that John should convey his real estate to Edward, and that Edward should make the assignment. Accordingly, on the 4th of March, 1879, John, by a deed in fee-simple, conveyed certain specific parcels of real estate to Edward; and on the same day Edward, by a deed of general assignment, conveyed all his property to John B. Mannix in trust for the benefit of creditors. On the same date the "Diocesan Trustees," who had issued no bonds and obtained no loans, executed a formal cancellation of the mortgage they held, and thereafter the trusts provided for in that instrument were abandoned. Subsequently questions arose as to the validity of this deed from John to Edward; and on further consideration it was thought that other property, in the name of John than that described in said deed, might be subjected to the payment of his debts. Suits and attachments were pending on the 12th day of March, 1879, when John B. Purcell, also by deed of general assignment, conveyed all his property to John B. Mannix in trust for the benefit of his creditors. In this court Mannix gave bond, on the 12th day of March, 1879, as assignee of Edward Purcell, in the sum of $250,000, with George Hoadly, John Holland, Charles Stewart and Michael Walsh as sureties; and on the 14th day of March, 1879, as assignee of John

B. Purcell, in the sum of $50,000, with H. H. Hoffman and M. Clements as sureties. The assignee caused an inventory and appraisement to be made of the assets and property that came into his hands from the two estates, which he filed in this court on the 23d day of May, 1879. In performing that duty he made but one inventory, designating upon the face of it by the initials "E. P." and "J. B. P.," the identity of certain items which he considered unquestionable, and leaving to others the task and responsibility of determining the rest.

By docket and journal entries of the same date it appeared that this inventory was filed in both cases, and no objection of record has been made to its form.

Although it is expressly provided by statute that an assignee shall file his account in the probate court at the expiration of eight months from the date of his appointment and qualification, John B. Mannix filed no account of his trust in either case until more than *six years* and eight months had elapsed after such date.

On the 30th day of October, 1885, for the first time, and then to escape citation, this assignee filed a report. It presents but one account of the receipts and expenses of both estates mingled together, without the formality of designating by initial letters or otherwise the estate to which any of the items belong. On the 10th day of December, 1885, this court,

on its own motion, having ordered the assignee to
show cause why he should not be removed, he
appeared, and in open court admitted that he had
misappropriated the funds of his trust and offered to
resign.    The court continued all questions relating
to the acceptance of his resignation for its further
order, and appointed a referee to examine him with
reference to the condition and his administration of
the trust.    On the 4th day of January, 1886, after
that examination had been completed, the court
accepted his resignation and appointed two trustees
selected by the creditors in his place.

The questions now before the court arise upon
exceptions filed to the assignee's account.

*Samuel A. Miller* and *E. Potter Dustin*, for
creditors.

*Thomas McDougall*, *Lawrence Maxwell*, *Jr.*,
*J. A. Jordan* and *Patrick Mallon*, for sureties.

GOEBEL, J., and ROBERT S. FULTON, Referee.

I.—A preliminary question presented by the record
is this :    Should the account of John B. Mannix, as
assignee of Edward Purcell, be separately stated and
distinguished from his account as assignee of John B.
Purcell ?

We think the two accounts should be separately

stated. There were two assignors, two formal assignments, and we think two estates. Edward's assignment was for the benefit of his creditors, and passed his personal property and choses in action, and the real estate conveyed to him by John. John's assignment was for the benefit of his creditors, and passed real estate not included in his conveyance to Edward. The indebtedness of these two persons to the same creditors did not merge their estates before the assignments, and the circumstance that both made assignments to the same person was not sufficient to merge them thereafter. Different bonds were given in these assignments, and sureties upon the one are not sureties upon the other. It was the plain duty of the assignee, therefore, to keep these two estates separate and distinct, each from the other. Whether his sureties, who have undertaken for the faithful performance of his duty according to law, can ground an objection to this account on the non-performance of that duty, it is not necessary now to inquire.

It has seemed to us that a separation of the accounts could injure no party in interest, and should be made as a matter of simple justice and orderly procedure. The difficulty of doing it is an objection to the labor rather than to the duty of the task.

The affirmative determination of this question has

led the court into an extended and laborious investigation.

The resignation of the assignee, and his precedent violation of the trust, have made it a manifest impropriety that he should be called upon to authoritatively separate and state these accounts.   The account and the exceptions to it have been filed and docketed in each case.   Both cases are before us upon all the questions presented by those exceptions.   On such a hearing it is the province ot the court to add to the account any omitted items that properly belong to it, and to take from the account any items that do not properly belong to it.   This implies the power and the duty to state the accounts.   If the result is not as satisfactory as could be wished, perhaps the number, character and variety of the items, neglect on the part of the assignee to properly describe and keep them distinguished, loss of public records, lapse of time, and want of clear testimony, would make any result of such an inquiry now necessarily unsatisfactory.

The accounts so taken and, stated dispose of all the questions before us.   Some of these it will be convenient to discuss in the order in which they were considered.

II.—1.   In attempting to distinguish property of the two estates, the first question to arise is, "What was the effect of Edward's deed of assignment?" As already intimated, we think it passed the real estate

conveyed to him by John. The validity of both deeds of March 4th has been directly assailed, and judicially established, in the case of *Brannan* v. *Purcell*, 41 O. St., 187. The result of that contest simplifies the inquiry in this. No other facts are now presented from which a different conclusion could be reached. In that case the court in effect held, not that Edward's assignment to Mannix was an assignment by John, but that because of the relations of Edward and John to the same creditors, the assignment by Edward had the same practical operation as an assignment by John; and hence, was in law a sufficient substitution for an assignment by John. Certainly, upon the face of the instrument Edward did not make the assignment as an agent of John, or for the benefit of the creditors of John. It was the very purpose of the two conveyances to transfer the real estate to Mannix by means of an assignment by Edward rather than by an assignment by John; and a court of last resort has sustained the validity of what was done. John's deed transferred all the estate and interest he held in the property to Edward, and Edward's deed transferred it to Mannix. Mannix received this real estate then by virtue of the assignment made to him by Edward, and as the assignee of Edward he is to account for it.

The realty described in John's deed to Edward consisted of eight parcels, which may be briefly described as the Eighth and Central Avenue property;

the Third and Plum Street property; the Mount St. Mary's Seminary property; the Morgan tract; the Considine farm; the Mt. Harrison lot; the Cathedral School property, and the Coleman property. Some of these parcels were incumbered by liens. The net proceeds of sales are chargeable to the assignee on the account of Edward's estate.

It follows, of course, that the personalty held by Edward on the 4th day of March was transferred to Mannix in the same way. The deed includes both realty and personalty, and if he held the personalty by no better title before, the arrangement entered into between him and John gave him as good a title as that by which he acquired the realty. All the personalty received by Mannix, except some personal and official effects, and several sums of money hereafter specified, has been received by virtue of the assignment made to him by Edward, and as Edward's assignee he is to account for it. This general line of separation between the two estates is subject to several qualifications.

2. John's deed of assignment to Mannix conveyed the residue of his estate. In terms it includes all the property of which "he was seized at law or in equity, including every species of estate, real or personal, which may by any proceeding at law or in equity be subjected to the payment of his debts." With the exception already stated, there was no per-

sonalty upon which it could operate. But John held real estate known as No's. 263 and 265 Third Street, and St. Joseph's Cemetery, which had not been included in his preceding deed to Edward. In addition to that he held nominally, at least, a fee-simple title in over two hundred parcels of land in the Catholic Diocese of Cincinnati, improved and in use for ecclesiastical purposes. Mannix, as the assignee of John B. Purcell and Edward Purcell, brought suit against John B. Purcell as Archbishop of the diocese, setting out in substance these conveyances from John to Edward, and from Edward and John to himself, and the several parcels of land conveyed by them, alleging that by reason of a claim that John's tenure of the realty had only been in trust for ecclesiastical purposes, there was a cloud upon the title, preventing him from making sale. In this suit lien-holders were made parties, and by foreclosure proceedings the Eighth and Central Avenue and Third and Plum Street properties were sold to satisfy mortgages, and yielded a surplus.

In the District Court, to which this action was taken, it was in brief held, that John's title in the realty was such as *prima facie* to subject it to the payment of his debts; that if in fact he held it in trust, it could not be subjected to the payment of his debts ; that the fact of a trust could be established by parol evidence ; that the evidence to establish a

trust must be clear, certain and conclusive, not only as to its existence, but also as to its terms ; and that if the evidence leaves it in doubt whether a trust was intended, the legal title will prevail. In the application of these principles to the case before it, the court also held that the Cathedral property, the Cathedral School property, and the Mount St. Mary's Seminary property, with other property not involved in the present inquiry, were held by John in trust, and were not assignable for the payment of his debts ; but that the assignee was entitled to an account in the case of each for advances made by John and Edward on behalf of the same ; and on the other hand that the St. Joseph's Cemetery property was not held by John in trust, and did pass to his assignee for the benefit of creditors.

We are governed by this decision. In logical effect it places in the account of Edward's estate the results of the foreclosure sales of the Eighth and Central Avenue and Third and Plum Street lots ; eliminates from his estate the Mount St. Mary's Seminary ; and charges to the account of John's estate the sale of lots in St. Joseph's Cemetery. The case has important bearings upon other questions involved in the exceptions.

3. So far as this account is now concerned, three pieces of property unsold stand much upon the same footing. Each, perhaps, indirectly was the source of

Assignment of Purcell.

some revenue, and the cause of some expense to the trust.

(*a.*) The Cathedral property originally included the Cathedral residence and the lot on Eighth and Central Avenue already mentioned. The title was in John. Prior to the assignment John had obtained a perpetual policy of insurance on the improvements, which Mannix as his assignee cancelled and converted into money, and replaced with other insurance at a less outlay. Prior to the assignment John had also paid considerable sums of money in the way of taxes on the property, which Mannix as his assignee subsequently recovered back in a suit against the county commissioners. Subsequently to the assignment Mannix received a sum of money on account of taxes paid on the property, from a priest in authority at the Cathedral; and has paid out several sums of money in the way of taxes on the property. So much of the property as remains unsold was held in trust, and the rest passed to Edward. But the taxes paid were partly on account of a portion of what was held in trust and partly on account of what was conveyed to Edward. · There has been no apportionment of these taxes, and there are no data before this court from which an apportionment could be made. Claim has been asserted by the assignee against the ecclesiastical successor of John for repayment of the same in a proportionate amount, and while the validity of

the claim is admitted, the amount has not been adjusted, and as to that it is still pending.

(*b*) We have seen that Mount St. Mary's Seminary was held by John in trust. It was an educational institution, but has been closed as such since the assignment   Mannix has received some small sums of money paid to him on account of tuition given in the institution, before the assignment, of course. Besides the building, it was provided with furniture, paintings, and a valuable library.   While the proceedings for the subjection of the property to the payment of debts were pending, expenses were incurred in the care and preservation of the property, which with some hesitation are allowed.

(*c*) The Coleman property was the subject of litigation.   Coleman had conveyed it to John, reserving a life-estate in himself.   John had executed back a declaration of trust, not of record, obligating himself to hold the property for certain charitable uses.   After Coleman's death his heirs brought suit against Mannix to set aside the conveyance.   In the litigation that ensued the validity of the conveyance was sustained and the trust established.   Proceedings in error were pending when a compromise was effected, and Mannix realized a small sum of money.   He also paid out a small amount for insurance.

We think Mannix received and paid these sums of money as the representative of John, in whom the

legal title to those properties was vested. *Prima facie*, each parcel was assignable for his debts, and until judicially decided otherwise, there was at least a doubt in the assignee's favor. If, by reason of that doubt, he realized moneys, he should certainly account for them, and account in the capacity in which they naturally came into his hands. And so as to expenses. In case of doubt an assignee should be allowed a reasonable discretion, and while it may be questioned whether some of these payments are fairly chargeable to the trust, we can not say that there was an abuse of such discretion in making them.

4. For reasons somewhat similar, we have charged to the account of John's estate the revenues received by Mannix from ecclesiastical sources.

From the "Diocesan Trustees" he received a safe, some office furniture, and a small sum of money. We have no data to determine whence this money was derived. The trustees were appointed by John, and paid the money, it would seem, as his representatives.

From the successor of John, in his ecclesiastical office, and from the secretary of his successor, several sums of money were received by Mannix, with the statement that the parties from whom the money came did not wish to be known. On what account, and on whose account these moneys were paid, we are left entirely to conjecture. In the absence of any testimony, we think it not an unnatural presumption

that the account should be indicated in the incumbent of the office through whom the moneys came.

5. Mannix received considerable sums of money in suits, the records of which describe the capacity in which he appeared, and determine the account to which his receipts in those cases belong. For instance, in the case of *Boyle* v. *Boyle, et al.*, No. 35,902, Superior Court of Cincinnati, he recovered expressly as the assignee of John B. Purcell only, and the amounts he received in that case are accordingly charged to the account of John's estate. In other suits he recovered expressly as the assignee of Edward Purcell only, and his receipts in those cases are accordingly charged to the account of Edward's estate. In such instances we see no reason for going behind the record.

But in the case of *Mannix* v. *Boyle, et al.*, No. 61,692, Hamilton Common Pleas, the record has not been accessible. It appears, however, from the testimony, that the suit was brought to set aside a conveyance. Prior to either assignment, John B. Purcell had made the conveyance to Boyle, taking a mortgage on the tract conveyed for the purchase money. John was indebted to Manning, and Edward was indebted to Westerman; the amount of the two claims being about equal to John's claim against Boyle for this purchase money. Prior to March, 1879, Boyle had transactions with Manning and

Westerman, under which the property was claimed by way of offset to John's lien for the purchase money. A compromise was effected, in which Mannix received sums of money from Boyle and Manning, and real estate from Westerman. As the original indebtedness from both Boyle and Manning was to John, we think the moneys received from them chargeable to the account of John's estate.

The case of *Grueter* v. *Mannix, et al.,* No. 69,988, Hamilton Common Pleas, relates to a portion of the "Considine Farm," and is more complicated. It appears that Grueter was the assignee of a lease executed in 1874 by John. The lease contained a privilege of purchase and a covenant of John to convey by warranty deed to purchasers in sub-divided parcels. A sub-division and sales of lots were made, the purchasers relying upon the covenant. After the assignments a controversy arose as to whether payments of money to Edward had been made on account of rents reserved in the lease, Mannix refusing to convey until his claim for back rents was paid. In the meantime a claim was asserted against an undivided fractional part (three-tenths) of the original title of John, in what is known as the Barr suit, which is still pending.

An entry was made under which Mannix received sums of money from several parties to the action, and was directed to hold a sufficient portion of the

same to protect the lot holders against claims in the Barr suit. And, that no element of complication might be wanting, John included his interest in the "Considine Farm" in his conveyance to Edward. The court in its action did not prescribe the amount to be so held, or distinguish between the two estates Mannix represented. What Mannix is to hold, we think he should hold as the representative of John, whose title was involved. The remainder belongs to Edward's estate. We are left to fix upon some arbitrary rule of division, and have divided the amounts equally between the two estates.

6.   Some rents have been received. Such as have accrued since the assignments, of course, follow title. The Block & Pollak rents were for the Third and Plum Street property, and go to Edward's estate. The McLaughlin and Connor rents were for Nos. 263 and 265 Third Street, and go to John's estate.

The ground rents received from George F. Meyers were on both accounts. He held a lease on part of the "Considine farm," under which rents were due at the time of the assignment and subsequently accrued. Mannix made no distinction in the amount in his inventory, his report, or his testimony. To arrive at some data the court *sua sponte* examined Mr. Meyers, and obtained from him the figures from which a division of that item has been made.

Concerning the further receipts, the division of the

account may be made without remark. Some are distinguished by the initials "E. P." and "J. B. P." in the inventory and account-books of Mannix, with which his account has been compared; some fall within principles already discussed, and the appropriate place of others will be apparent.

III.—There has been controversy as to whether Mannix should not be charged with certain items which do not appear in his account. It is quite clear that some of these items are chargeable. It was developed in the examination of Mannix that payments were made to him of various amounts ($500, November 18, 1879, by E. P. Bradstreet; 50 cents, December 11, 1879, by Mary J. O'Neill; 32 cents, February 2, 1880, by Abner Longshore; $350, October 9, 1880, by Ann Spanhorst; $23.54, December 7, 1880, by Johann Thilman; $5, August 7, 1882, by Winifred McDonnell; $10, August 22, 1882, and $30, June 20, 1884, by Peter Burns; 50 cents, August 6, 1883, by Daniel Lehan; $111.91, May 23, 1885, by Mary E. Hadley; $20, October 1, 1879, and $20, January 1, 1880, including coupons of United States four per cent. bonds), all of which are omitted from his account. They are now charged, each in its appropriate account, in the accounts stated.

The principal item in this controversy relates to $10,800, par value, United States four per cent. bonds. Such an item is included in the inventory and appraise-

ment filed May 23, 1879. In his account he credits himself with purchases of such bonds in par value as follows: April 12, 1879, $4,550; May 5, 1879, $1,250, and May 17, 1879, $5,000, aggregating the same amount, $10,800. It would appear, therefore, that on the latter date he had on hand, to account for, $21,600 of such bonds, including bonds appraised and bonds purchased. But Mr. Mannix testifies that the bonds appraised and the bonds purchased are the same bonds; that he received no bonds by the assignment; that he purchased these bonds from moneys collected while the inventory was in progress; and that, having them on hand when the inventory was filed, he had them included in it and appraised. Circumstances seem to corroborate this explanation. A calculation of the receipts and expenditures to May 17, 1877, leaves in Mannix's hands a sufficient sum of money to have made the purchases. And considering the long financial stress that preceded these assignments, the possession of Government bonds in any considerable amount by the assignors seems, at least, very improbable. We have, therefore, accepted the explanation.

As such purchases necessarily required the use of moneys collected on account of John's estate, as well as Edward's, we have put an equitable proportion of the bonds so purchased into each account.

It is questionable whether other items claimed on

behalf of the trust ought not to be charged against the assignee. But as an assignee should be allowed some latitude of discretion, and the testimony should clearly charge him, they are denied place in the accounts.

IV.—We come now to the other side of this account in which Mannix credits himself with sundry items of expense, investments and compensation. Here the questions relate more to the propriety of the amounts than the division of the items; the separation of the two estates on one side of the account being followed, of course, by a corresponding separation on the other.

1. Mr. Mannix credits his account with payments of clerk hire from the date of the assignment to September 2nd, 1882, a period of about three years and six months, aggregating an amount of nearly seventeen hundred dollars. Clerical services in the office of the Auditor and Recorder of Hamilton county are not included, and were paid for separately. He claims to have paid nearly all this money to a law student in his office, continuously employed to write letters, investigate claims and to prepare and take the proofs of claims of creditors without charge to the latter therefor. It was no part of the assignee's duty to perform notarial work for the creditors. And if, during the first year following these assignments, Mr. Mannix, and his law partner, and his clerk were

able to perform the clerical labors imposed upon him, including the preparation and proof of claims, it seems to us that Mr. Mannix and his law partner, after the first year, could have performed such labors as remained without the aid of a clerk. We therefore credit the payments for clerical services for one year, following the assignment, as set out in his accounts. And as these services were rendered to both estates, and some arbitrary division must be adopted, we follow the obvious one and apportion one-half of the expense to each estate.

2.   Mr. Mannix credits his account with payments of office rent from the date of the assignment to November 1, 1885.   The period covered is six years and eight months, and the aggregate amount is nearly twelve hundred dollars.   It appears that there were many creditors, and that for months after the assignment they crowded the office of the assignee and his partner to such an extent that additional office room was necessary.   It was the duty of the assignee to receive proofs of claims and answer reasonable inquiries.   We think that under the peculiar circumstances of this assignment, office rent for one year following the date of the assignment is not an unreasonable or improper charge against the trust. But it was not the duty of the assignee to provide a special office for the entertainment of creditors after the claims were filed and before any dividend was to

be paid.  And if he continued to retain a separate office for a period longer than we have named, it was obviously more for his personal convenience than by way of any benefit to the trust.  For reasons already given, we divide this expense equally between the two estates.

3.   Considerable expense in the way of attorney fees, notary fees, printing, costs, etc., was incurred in the case of *Mannix* v. *Purcell*, already mentioned as having been brought to subject property.  So far, in the main, the suit has been unsuccessful.  But no question is made as to the propriety of such a suit, or the amounts paid.  The question is, "which estate should bear the expense of this litigation?"  The title of most of the property sought to be subjected was in John; but several parcels included in the petition were in the name of Edward.  Mannix sets up both assignments in his petition, and brings his suit as the assignee of both Edward and John.  The object of the action was to subject property to the payment of debts; but the debts to be paid were the debts of both Edward and John, and one estate was to profit by the litigation as much as the other.  In the result actually realized, John's estate receives the benefit of the Cemetery lots; while Edward's estate takes the surplus of the foreclosure sales.  It seems, therefore, unjust that either estate in assignment should bear the whole burden of this expense.  As it was incurred for the equal benefit of both

estates, and in a measure involved both estates, we divide it equally and charge one-half to each.

There is an apparent exception. Copies of records were procured from different counties embraced in the diocese, in which John held real estate. These records were the muniments of his title. It may have been proper to use them for other purposes than as evidence in this particular action. As the expense is so directly connected with John's estate, we have charged it to John's estate. And we have similarly charged the taxes paid in Auglaize county.

V.—In the matter of investments, Mr. Mannix's account is false and fraudulent. On his examination he admits that it contains many entries of purchases that were never made. He mildly speaks of them as entries of "purchases that he should have made," which is only another way of saying that they are entries he should not have made of purchases that he did not in fact make. The purpose of these fictitious entries is apparent. The money represented by them had been converted to his own use, and the law required him to account for it, with six per cent. interest from the date of conversion. Government bonds bore a lower rate of interest, and there would be a clear profit to him by practicing this deception. He admits that he used many thousands of dollars of this trust property in private speculative transactions, of which there is not the slightest intimation in his report from beginning

to end. And after squandering the whole trust estate until only a little remnant of depreciated securities is left, he crowns the infamy by deliberately coming into court with a false report, over his signature and oath, setting out solemn reasons why it was impracticable to make any settlement of the assignment, and why it was proper and necessary "that the funds in his hands shall be held by him, invested as shown in his foregoing account."

It is difficult to trace these transactions. Mr. Mannix did not confide them even to his books, and the only record preserved of them is in loose memoranda. But while difficult, it is perhaps unnecessary, for the purposes of this account, to trace them. Profits and investments all went one road, and but little survives the general disaster.

1. At the date of the filing of this account, however, he admits that he had on hand 301 shares of Cincinnati, New Orleans and Texas Pacific Railroad stock of the par value of one hundred dollars each, and 200 shares of Mt. Adams and Eden Park Railroad stock of the par value of fifty dollars each, which he purchased with trust funds. In his account there is no entry of any purchase of such stock, or of any dividend received on account of it. From the memoranda and testimony of Mr. Mannix, it appears that he purchased the former stock as follows: October 6, 1881, 100 shares at par, $10,000, in the name of

Charles Stewart; same date, 150 shares at par, $15,000, in the name of M. Walsh; October 19, 1881, 44 shares at $1.07½, $4,730, in his own name as assignee, and March 15, 1882, seven shares at 98½ cents, $689.50; and the latter stock, in one purchase, March 16, 1882, at 90 cents, $9,000; and that he received dividends on the same as follows: On the former stock, January 20, 1882, on 294 shares at $1.50 per share, $441, and February 5, 1883, on 301 shares at $3 per share, $903; on the latter stock, July 10, 1883, $100; October 11, 1883, $100; January 12, 1884, $100, and April 10, 1884, $100. If there were other dividends the fact does not appear. He had no authority to purchase these shares, and they have depreciated in value. Since filing his account he says he has acquainted his sureties with the situation of his affairs, and delivered the shares to them by way of "indemnity." It will hardly be contended that his sureties, " acquainted with the situation of his affairs," could hold these shares by way of "indemnity." We treat the shares as still on hand, credit his account with the amounts paid for them, and charge it with dividends received, and the depreciation in market value on the first day of this term.

2. The loss in market value of these stocks became so great that Mr. Mannix resorted to the tender mercies of Wall Street to retrieve it. Here his investments melted away like snow-flakes in the

morning sun. When the money resources of his
trust were exhausted, the box in the Safe Deposit
Company was rifled of its bonds. The spell was
upon him, and neither pride of manhood, nor profes-
sional reputation, nor loyalty to friends who had
honored him in this trust with their confidence,
checked his course until all was gone.

We have now to deal with the matter only to the
extent of correcting his account.

(a.) It appears from the examination of Mr.
Mannix that in these stock speculations he hypothe-
cated bonds of his trust as follows :

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1882, | Nov. | 21, | U. S. | four | per | cents | $ | 500 |
| 1883, | May | 13. | " | " | " | " | | 6,000 |
| " | Aug. | 18, | " | " | " | " | | 3,500 |
| " | " | 29, | " | " | " | " | | 4,500 |
| " | Oct. | 17, | " | " | " | " | | 9,000 |
| 1884, | April | 2, | " | " | " | " | | 10,000 |
| " | " | 15, | " | " | " | " | | 4,000 |
| " | " | 23, | " | " | " | " | | 16,000 |
| " | " | 29, | " | " | " | " | | 7,000 |
| " | " | | Dayton | & Mich. | fives | | | 10,000 |
| " | May 27, | U. S. | four | per | cents | | | 2,500 |
| " | " | 31, | " | " | " | " | | 8,500 |
| " | June 30, | " | " | " | " | | | 2,000 |

$83,500

These collaterals were sold by his brokers from
time to time to cover losses by the depreciation of
his stocks. On what dates and at what prices they
were sold does not appear. These transactions were

wholly without any pretense of authority or justification, and each deposit of the trust funds was a conversion of them to his own use. His account, therefore, is to be charged with the market value of the deposit on the day of deposit; and having charged himself in his account with interest on the securities after the dates of the deposits, it is proper that appropriate deductions be made in order that his account may carry interest.

(*b.*) The assignee also *sold* bonds for which he does not account. His report is so framed as to convey the impression that on the 30th day of November, 1885, he had on hand in the vaults of the Safe Deposit Company, United States four per cent. bonds of the par value of $132,000; when, as his examination discloses, he had not a dollar in bonds of any kind on hand, and had not had for more than a year. This showing was accomplished by crediting on one side of his account purchases of such bonds during the years 1884 and 1885 in an aggregate amount, par value of $40,000, not one of which he ever bought; and by charging himself on the other side of the account with receipts of interest on coupons he never received, to give color to his report, and omitting to charge himself with the proceeds of bonds actually sold. His system of false entries and omissions of entries has involved the bond investments in hopeless confusion. We have data, how-

ever, for a finding that is approximately correct and that can do no injustice at least to Mr. Mannix. In his testimony he admits purchases of United States four per cent. bonds in par value, aggregating $116,-400; that $24,400 of the same were sold as charged in his account; that he hypothecated $73,500 of the same with his brokers; that he sold the rest to buy stocks; and that he was overwhelmed with losses in his stock speculations in the month of May, 1884. It appears, therefore, that he sold $18,500 of these bonds at rates and prices that do not appear. We charge him with the market value of the same on the 1st day of May, 1884.

His account filed does not credit him with the purchase of a five-hundred-dollar United States three per cent. bond, sold by him January 26, 1884. We credit him with the purchase of the same on the 12th day of September, 1883, from data in evidence furnished by the United States Treasury Department.

Corresponding corrections of interest entries have been made wherever it is clear that the entries charged in the account filed are erroneous.

3. There is fine irony in one item of expense that may be disposed of in this connection. He credits himself with a payment of twenty dollars for rent of box in the Safe Deposit Company, April 17, 1885, nearly a year after it had been despoiled of its valuables. His explanation is that he expected "to

recover back what he had lost." The ground of this expectation, however, is not disclosed. We think it was not sufficiently well founded to justify the expenditure.

VI.—In the matter of compensation Mr. Mannix has taken the whole affair into his own hands, and deals with it broadly and liberally.

The statute provides that a commission upon the amount collected and accounted for may be allowed to an assignee before any dividend is declared; and that such further allowance shall be made for extraordinary services and counsel fees as shall be considered just and reasonable by the court, but provides that no such further allowance shall be made unless a bill of items shall be filed, with an affidavit showing that the same were performed for, and were necessary to the assignment, and that the amount charged therefor is reasonable and not more than is usually paid for such services.

No allowance of compensation out of the trust fund has been made, and the statutory bill of items and affidavit are not presented. But the form of the account brings the matter before us, and the technical irregularity may be waived. This account contains seventy-five entries in which Mr. Mannix credits himself with payments to himself and his firm on account of commissions and counsel fees, in the aggregate amounting to over forty thousand dollars.

In his examination he says of these credits that " the amounts were entered but just prior. to and during the preparation of the account, and the payments were not made as would be indicated by the vouchers." He offers testimony as to the propriety of the charges.

1. The claim for commissions amounts to nine thousand dollars. We think the claim should be denied in any amount. "May be allowed" is the language of the statute. This implies the exercise of judicial discretion. A duty to allow in a proper case imposes the corresponding duty to disallow in an improper case. Courts deal with trustees according to their conduct. Mr. Burrill thus states the rule:

"Where trustees act in good faith and with due diligence, they receive the favor and protection of the court, and their acts are regarded with the most indulgent consideration; but where they betray their trust or grossly violate their duty, or where they have been guilty of unreasonable negligence, their acts are inspected with the severest scrutiny, and they are dealt with according to the rules of a strict, if not rigorous, justice." And in a note adds: "It is necessary, in such case, that rules somewhat of a stringent character should be established, to prevent speculation in trust funds, and to induce fidelity of conduct." Burrill on Assignments, Sec. 462.

The practical application of the rule is thus stated by the same authority :

" Compensation to an assignee, in any form, is always on the supposition and condition that he performs the duties incumbent on him under the assignment. Hence, if he is guilty of gross carelessness, or misconduct, or violates the trust, no compensation will be allowed him. And if he maladminister and refuse to account, both compensation and expenses may be refused him." *Id.*, Sec. 425.

Now, if the assignee who presents this claim is not guilty of unreasonable negligence and misconduct in his office; if he has not violated his duty or betrayed his trust, it would be difficult to conceive a case to which the rule could apply. The law required him to file an account in eight months, and after taking the eight months, he neglected for more than six years to file any account whatever. The law required that his account, when filed, should fully exhibit all his doings and the condition of the estate; and the account he *did* file was studiously framed not to exhibit his doings and to conceal the actual condition of the estate. The law and every principle of honor required him to guard and preserve the trust fund as the apple of his eye; and he has deliberately squandered the whole of it in private speculations.

2. The claim for counsel fees exceeds the sum of thirty thousand dollars. This is wholly a claim for compensation, and is in addition to an actual expense for legal services of over three thousand dollars

already paid, charged in his account, and allowed. But for one element it would raise only the question just disposed of. These counsel fees are credited in part on account of the services of Mannix himself, and in part on account of the firm of Mannix & Cosgrave and Mannix & Moorman, of which he was a member.

(*a.*) It is quite clear from the authorities that Mr. Mannix is not entitled to any allowance for legal services he has performed. In the case of *Gilbert* v. *Sutliff*, 3 Ohio St., 129, an assignee who had maladministered was refused compensation on the ground that he had involved the beneficiaries of the trust in more expense than he had incurred. So here. It is apparent that the beneficiaries of this trust have incurred much more loss by the maladministration of the assignee than all his claims for compensation together. No allowance to Mr. Mannix for counsel fees could be "considered just and reasonable," in our view of this matter, and none is made.

(*b.*) No testimony was offered to show that Mr. Moorman has performed any legal services on behalf of this trust. Services by Mannix, while a member of the firm, and in the name of the firm, would give the firm no better claim upon the trust than Mannix would have in in his own name and behalf.

(*c.*) But it does appear that during the existence of the firm of Mannix & Cosgrave, Mr. Cosgrave

did perform services to the estate. We have had and considered testimony as to the value of his services in that behalf. In a general way he gave valuable attention and services to the estates from the assignments down to the dissolution of the partnership. He spent much of this time in the preparation and trial of the case of *Mannix* v. *Purcell*, already mentioned. Other counsel were employed to conduct the trial, and the litigation has not yielded much profit to the trust. It is not usual to allow large counsel fees in an unsuccessful suit. But we think Mr. Cosgrave performed services which should be credited in this account. Considering all the circumstances we think the sum of five thousand dollars would be a just and reasonable allowance for the same, to be credited as of the date of December 31, 1882, and divided equally between the two estates.

VII.—Under rules as well established and familiar as any in jurisprudence, this account is to be charged with interest. A trustee of any kind who delays unreasonably to account; who makes false and evasive statements of the condition of the trust estate in his hands; who holds large balances of trust moneys without making even a partial distribution; and who converts trust funds to his own use must account with interest; and there is every element requisite to this case for the application of the rule. In case of gross delinquency, the weight of authority

seems to favor a charge of compound interest with annual rests, though the practice is not uniform. In the present case only simple interest will be charged. As his account was not due until eight months had elapsed from the date of his appointment and qualification, we do not charge him with interest on moneys in his hands during that period. We balance his account on the first day of December, 1879, and monthly thereafter. These balances on either side of the two accounts will be charged with interest to the first day of this term.

In conclusion, we find that on the first day of this term John B. Mannix, as assignee of John B. Purcell, was indebted to the estate of John B. Purcell in the sum of $55,827.46 on his account as assignee; and an order will be made that he pay the said sum of money, with interest from the first day of this term, to Isaac J. Miller and Gustav Tafel, trustees of the estate of John B. Purcell in assignment.

And we further find that on the 30th day of October, 1885, John B. Mannix, as assignee of Edward Purcell, had on hand 301 shares of stock in the Cincinnati, New Orleans and Texas Pacific Railway Company, of the par value of one hundred dollars each, and 200 shares of stock in the Mt. Adams and Eden Park Railway Company, of the par value of fifty dollars each; and an order will be made that he deliver the said shares of stock, with any dividends

since received thereon, to Isaac J. Miller and Gustav Tafel, trustees of the estate of Edward Purcell in assignment.

And we further find that on the first day of this term John B. Mannix, as assignee of Edward Purcell, was indebted to the estate of Edward Purcell in the sum of $305,827.70 on his account as such assignee; and an order will be made that he pay said sum of money, with interest from the first day of this term, to Isaac J. Miller and Gustav Tafel, trustees of the estate of Edward Purcell in assignment.

NOTE.—Judgment affirmed in Common Pleas Court.